3-11-019 Joseph Thompson and R.B. Family Farm Steak Appellees by John McMillan v. Phillip R. Moore Appellant by Markham Spears Mr. Spears I please the court, counsel. My name is Markham Spears and I represent the appellant Phil Moore on the two issues presented on our brief. The first issue being whether or not the trial court's decision was against the manifest weight of the evidence with respect to whether Byers and Thompson established all of the elements of adverse possession. And the second issue being whether or not a mortgage foreclosure action has the effect of foreclosing the rights of a person who may have an adverse possession claim. Concerning the first issue, the trial court was incorrect in not giving every presumption in favor to the record title holder in this case, which was clearly Phil Moore. After a record title holder is established in an adverse possession analysis, the court must give every deference or presumption to that record title holder. And then only can be swayed once the trial court has satisfied themselves that all of the elements of adverse possession have been proven by a clear and convincing standard, which is the highest standard in our civil law. In the trial court's analysis, it never clearly states for the disputed area who the true title owner of record was. However, the record, including the joint stipulation entered by the parties, clearly sets forth that Phil Moore, my client, owned the property north of what is called the Cedar Fork of the Spoon River or the Pecuni Creek. It has several names down through the histories. And that Byers and Thompson's legal description actually indicate that they own land south of the north bank of what is also referred to as Cedar Creek. Those names all mean the same thing. Basically, there is a creek that runs in a remote part of Warren County. And on that, the disputed area is bordered on the south by this creek and on the north by a fence line. My client claims ownership to the disputed area, and the appellees claim ownership to the disputed area, two different sections of it, because their land, they claim, bifurcates that. So Byers owning on the west side, Thompson owning on the east side. The legal descriptions that both of them took title, that they both took title to their property, indicate that they own south of the north bank of that creek. There is no writing in place or in the legal description itself that refers to this fence line. The only thing of record that refers to anything is to the creek itself, whether it be the north bank or being owned north of the creek. With Phil Moore being given every presumption, Byers and Thompson's were left with the burden of trying to prove all of the elements of adverse possession for a period of 20 years. They took title to their property in 1994, which you count 20 years out from that, and it would be 2014. Obviously, they can't get there, so they had to tack on from prior owners. And their claims essentially fall short, and the reason is is that the use that they show isn't adverse. And adverse, of course, doesn't mean that they're out there with spears and chucking things or anything like that. It just means that they're asserting ownership to the exclusion of all others. Again, this disputed area isn't in an urban setting. It's in rural Warren County. It's in kind of a bottom ground that isn't visited by either party daily, if not monthly or bimonthly. So your acts of dominion over that for the purposes of stabbing adverse possession, I will agree that it takes something less than maybe a yard here in town or in the city. But the fact of the matter remains, there is no border. The cases that the appellees want to rely on are the clean cut, hey, there's a fence. We fenced in that area, and now we own it. This case is different than those because there's no evidence in the record that on the east and west side of this disputed area that there are fencing. So you've got a nice little rectangle or whatever of area fenced in. Can I ask a question? The only thing that wasn't clear to me from reading this was, you know, the fence. Sure. The proponents call it a division line fence. Who paid for that fence? There was never any evidence in the record as to who actually paid the bill for that fence that I recall. The fence was not built by any of the parties in this case. So I can't tell you specifically who paid for the actual construction of that fence. I can tell you that there was evidence in the record that there was a subsequent fence that was further south and that when this new fence was constructed in 1985 or 86, which could never be definitively said, it was moved further north at that time. And there was some evidence in the record as to the remnants of that fence that was to the south and closer to the creek. But since the disputed area is a remote vacant piece of real estate, it does show you only need a lesser showing of dominion. But if you look at the Willever case, that case says, hey, going out and making a trail through the property or maintaining that trail isn't enough to show dominion. And in this case, you've got two different appellees and their claims to dominion. Buyers claiming, you know, he's always run cattle on the small section that affects him. And Thompson saying since he owned the property since 1994, no cattle has been run on it. However, he does occasionally walk on it, as he stated. So as I've stated, their reliance on this neat enclosure argument, I guess, fails here because if the court wants to accept that argument, my client has the same argument because he can say, hey, I enclosed that disputed area with the fence and then the creek to the south. The trial court also did not take any notice of the fact that there was evidence in the record that the land to the north of this creek is inaccessible by automobile or anything but foot by Thompson and Byers. The only way they can get to this property with any means of transportation would be through my client's property. And there was evidence in the record that there are actually gates along this fence that would allow my client access to this disputed area. My client did put in a new gate more recently, but there were two gates when he bought it that had been there. And he assumed based on the legal description that he, in fact, owned that property. And again, this is a property that you're not always, you never see anybody on it, basically. And if you see a cow on it, you'd be lucky because Thompson never had cows on his property. He admitted since 1994. You'd have to catch him. I mean, his testimony was he may be on it six times a year. So you've got basically less than a 1% chance, six out of 365, to catch somebody on the property. My client's testimony was that, you know, he had maintained south of that fence by clearing some brush. But he wasn't out there every day either. And I guess the point of it being the tie-out go to the runner. The runner here being the person that had legal title to the property. That being my client. Every presumption should have been given to him. But I don't think that's the case because the trial court never clearly says who is the legal title holder to this property. They never say that. And part of the reason is because the appellees were stuck on that 1895 survey, which is a drawing of crude. At the time, I'm sure it was cutting-edge technology. But it was just a hand drawing of the different tracks in that quarter section. And then there was a legal description after it referring to south of the north bank. But their contention has always been that that dotted line on that survey, as opposed to the solid lines, represents a fence line. Although there was never any evidence in the record that there was, in fact, a fence line there in 1895. Our contention is the dotted line, in fact, meant that they were trying to show the creek. And that was their way of doing that back then, the surveyor. So they also, the trial court, again, draws inferences that this must have been a division line because why would these people have gotten together and talked about this fence line, even though there's no evidence in the record that somebody heard or knew that this was actually going to be an agreed-upon division fence. That's their claim and their complaint. But there's no evidence in the record that there was a conversation between the predecessor owner saying, yeah, we're going to make this the division line. They got together and supposedly built the fence. But who knows if it was agreed upon to be a division fence. Well, if it's a division fence, why would there be gates in it leading to your client's property? That's our point exactly, Your Honor, or Justice. I mean, why would there be? It makes no sense. On to the second issue, which I think is a little, is definitely a legal issue and it wasn't raised at trial as much as it was raised in a motion to dismiss, is this effect on this foreclosure action, which happened in 1996 when my client bought the property. He bought it at a sheriff's sale. And foreclosure law is clear, along with the Code of Civil Procedure, that the effect of a judgment coupled with the sheriff's sale, that the sale is ultimately confirmed, basically gives that person new title to the property. Now, I grant you that you have to make sure you serve all of the parties of record that have an interest in the property with personal service. But there is a provision for unknown owners. Unknown owners being people that may have a claim to it, but you don't know. And I guess my point with that is there were people on this property on a daily basis to know who they were, so the unknown owners basically cleaned up the title. And the issue being, what kind of title does a judgment foreclosure give to a person at a sheriff's sale? Our contention is it gives new title. Similar to the Wisconsin case of Sedlak, even though that was a terrible result for that person, you've got to have some finality in the law. And so when you go and buy something at a sheriff's sale, you presumably buy what's in that deed, the legal description in that deed, that being what was north of the creek, as it states in the legal. My client had no reason to think somebody else owned south of that fence at that point. There were gates to access it, as Your Honor clearly states. Now, the appellees want to argue that they weren't technically unknown owners. They were parties in possession. Well, that term is not technically defined in the Foreclosure Act. They talk about people with a possessory interest. Case law has gone on to define that as a tenant. Well, I guess I would argue that there's a difference between a tenant and a trespasser. A tenant has a legal right to be there. A trespasser doesn't. Do foreclosure actions have to include all trespassers? You know, I would argue they don't. Certainly, a tenant, if you want to extinguish their rights, they would. But that presumes that they have a legal right to be on the property to begin with. Do we know how many total acres we're talking about in this view? I would suggest, Your Honor, that it's probably less than an acre and a half. It's not much. And it's not productive ground. It's what I would call ground close to a creek. If you were ever a kid and played out in the woods, it's, you know, the marginal fringe between the creek and the productive ground. So it doesn't hold a lot of value as far as production. It's got pretty expensive resources. That's correct, Your Honor. It did. So. Thank you. This party in possession argument to me is somewhat of a red herring because the appellees want to argue in one case that, hey, yeah, we did own to this fence line. Therefore, we're not unknown owners. And really, we're going to be party in possession. We would actually be owners. But if that's the case, they could have asserted an affidavit of adverse possession to put the world on notice, especially if they're reading the legal notices. It says, hey, we're foreclosing on property north of this creek line. I guess my inclination would have been, oh, my gosh, they're claiming they own north of this creek. I always thought I owned it. And here I need to basically at that point assert my rights to that if I actually have good title to it in an adverse possession claim. But that wasn't done. And the fact of the matter remains, those two, Byers and Thompson, acquired ownership in 1994 prior to the foreclosure action. So, I mean, they had the ability to do that. And I guess the analogy that I draw to is just because somebody builds a fence on one side of a creek doesn't mean they're giving up ownership rights to what's between the creek and the fence. I mean, look at the political turmoil about border fences. I mean, if the United States builds a border fence with Mexico, not that you can have an adverse possession claim against the government. I realize that. But they're not building that fence in the middle of the Rio Grande, I'm guessing. I haven't been there. They're building it on the north side of it. There's going to be a gap. I don't think that we're ceding that portion of the United States to Mexico when we build that fence. And the other thing would be when you have conflicting issues with disputed areas, a natural boundary versus a man-made boundary, I think the law has to be that the natural boundary governs, especially when that's the boundary that's listed in the legal description. We're from a rural part of Illinois. We don't get everything surveyed. In fact, we rarely get things surveyed because armors are inherently cheap. But because of that, you often rely on legal descriptions, and those legal descriptions have come down for hundreds of years. And if you can't rely on them, I don't know what you can do. Thank you, Your Honors. Any questions? Okay. Thank you, Mr. Spear. Mr. McMillan. May I please escort counsel? Good morning. I'm John McMillan. I represent Byers Family Farm and Joseph Thompson, the plaintiffs in this case who filed the quiet title action. As far as the case law goes, throughout the cases in Illinois on adverse possession, there's a sharp distinction between those cases in which there is a fence that encloses the property that the person is claiming and the cases in which there is no fence. And I emphasize that in my brief. I cited the case of Joyner v. Jansen in the Plow case, the same ones that the judge relied upon in rendering his decision. Well, let me ask you. If I go home and build a fence on my property and it's not on the property line, do I cede that portion of the property outside the fence to my neighbor by virtue of not putting the fence on the property line? Well, if there's a belief that that is the property line between you and your neighbor, yes, once that fence has been there for 20 years. So if your neighbor on the other side of the fence treats everything on the other side of the fence as his, as we had in the Joyner case. Isn't it different if he comes over on my property and builds a fence on, you know, comes over and onto my property and fences off some of my property, as opposed to I put a fence, say a decorative fence, for whatever reason, and, but it's not on the property line because I'm on a lawnmower or whatever, get equipment by there. There's a lot of fences that are not intended to be on the property line. People build a fence on their own property. Now, if you build a fence on your property, let's say it's a decorative fence, you're going to continue to mow on the other side of that fence. You're going to go ahead and treat that property, the remainder of that property, as yours. Do you ever try to maintain a fence along a creek bed? Well, actually, yes, but that's been a long time ago. Well, they have a tendency, the creek banks cave in and what have you, and floods and high waters, and the fence has always fallen down and caving in. Nothing unreasonable. Is there about moving the fence away from the creek a little bit to make it a little easier to deal with? Well, and the evidence in this case is that they did exactly that when they rebuilt the fence. There's testimony that the creek had washed underneath the fence in one location, and when they rebuilt the fence in its current location, they actually moved it away from the creek because the creek had washed into the fence. There is that testimony in the record. Does that testimony help your opponent? This testimony comes from Mr. Byers and Mrs. Cunningham, whose husband was involved in the construction of the fence. Most of the people who built the fence, the adjoining landowners, are deceased. Mr. Brooks, the predecessor entitled to Mr. Byers, is deceased, but Mr. Byers was there when the fence was built. Mrs. Cunningham was there when the fence was built. They testified to the fact that, yes, in one location the fence was moved away from the creek because the creek had washed into the fence. The court never did define what was meant by north bank of the creek. So as counsel has pointed out, there isn't any finding about where the record title line is because there is no finding of what is meant by the term north bank of Cedar Creek. Well, wouldn't it be unreasonable to find that that term means the north bank of the Cedar Creek? Well, we have to define what the bank is. Is bank a point at which you can construct a fence? Because clearly if my clients owned the north bank of the creek, they owned the creek. So when a fence is built, it's built on the north side. We're all central Illinois boys here and girls, and we know what a bank of a creek is, right? I mean, ordinary customary uses, we know what that, we know what a creek bank is, don't we? Yes, and I think we know how fences are built so that they can contain livestock. And they're not a straight line, but they're not a meandering line like the creek is either. If in fact this was a division, intended to be a division fence, why would there be gates then onto your opponent's property? Even the testimony about the construction of the fence indicated that in order to get to this fence location with a truck, you have to drive across what is now Mr. Moore's property to get to that location. So you don't have to cross the creek with the vehicles to get to the location to build the fence. As far as why are there gates in there, cattle get out, sometimes you have to get the cattle back in. The evidence that was presented... Well, that would indicate the fence was there to hold the cattle on the other side of the fence. The evidence is there weren't any cattle on the other side of the fence. The cattle are contained on my client's property. Mr. Byers was a tenant on the property before he became the owner. When Mr. Thompson bought the property in 1994 and built a house, he no longer ran cattle, he ran a fence, he constructed a fence between himself and Mr. Byers. But before then, Mrs. Cunningham testified that she and her husband rented everything south of the fence in that quarter section. And they ran cattle to the fence. Joyner v. Jansen also stands for the proposition that The use necessary to establish possession is a customary use for the type of property involved. This is farm pasture. They ran cattle, they used the creek as water. There's testimony that the cattle can cross the creek. The fence was placed on the north side of the creek in order to contain the cattle. That's the use of the property, and that's the historical use for more than 20 years. Well, not all of it, right? By the way, is that about right that we're talking about it between an acre and an acre and a half of ground? That's correct, Your Honor. There are some pictures in the record, I think. They're not very good. They're not good when they're photocopied. There's not much there. One of your clients said his use of the property was to walk on it maybe half a dozen times a year. Yes, after Mr. Thompson bought the property, he did not use it as pasture for cattle. He built a home there, and this is just part of his homestead. And he walks on the property as part of his homestead. Six times a year. Probably that's how often he gets to the other side of the creek. That was his testimony. Well, if I am on the other side of that fence, how am I supposed to blame that this guy is claiming ownership of that property by virtually walking on it six times a year? I guess maybe the better question is why is the fence there? The fence has been there for years and years. There's a change in ownership, there's a change in character, and there's a change in use consistent with the change in character of the property. No longer pasture, it becomes his residential property. He uses it as someone would use a residential property strictly recreational purposes. But the distinction between the cases cited where someone is running a four-wheeler across unenclosed property is that this is not unenclosed property. This property was enclosed with that fence long before Mr. Thompson even purchased it. Well, this is a single fence that runs east and west, correct? That's correct. Okay, well, one fence line can't enclose property. Well, there would be. The testimony is that a fence was constructed by Thompson buyers between their properties. There's also the testimony that on what would be the east end of the disputed area is the Cunningham property, and Mrs. Cunningham testified that there is a fence between her property and the Thompson property. So that closes the east end. There is not on the west end because Mr. Byers owns more ground to the west end. So he didn't put any fence between himself and what he also owned where he runs the cow. So as far as the distinction of a line between my clients and Mr. Moore, it's a complete fence. It completely separates the properties in question. Earlier you stated that the fence, the old fence, was placed and somehow it was actually in the creek or at the edge of the creek and that it was washed away and that when it was replaced it had to be moved a little bit so that it would remain intact. And by virtue of that, if the reason that the fence is moved is only to protect the integrity of the fencing, I don't know how you get that that is indicative of an intent to move a property line if you're maintaining that the fence itself is the property line. Well, the new fence was constructed, the testimony is it was constructed by the adjoining property owners. Mr. Houston, Mr. Brooks now deceased, Mr. Cunningham now deceased, and they made the decision when they needed to rebuild the fence because under the Illinois Fence Law there's a joint obligation by the adjoining property owners to maintain the fence. Who paid for the fence? Nobody knows. The gentleman who paid for the fence is probably deceased. One of our pieces of evidence indicating that the fence was there more than 20 years is that Mr. Brooks died more than 20 years before this case was commenced and he was one of the people who built the fence. So that's how we establish it. We have nothing in the record to show who built the fence. My clients don't know and I doubt if Mr. Moore knows who actually paid for the fence. But we know who was there and the testimony of who was there to decide where to locate the fence and they located it when they rebuilt it so that it wouldn't be in the creek. It would be on the north bank of the creek. But if the intent was to be a division line fence, wouldn't that be an important piece of evidence to know who paid for it because if it was a joint fence on a division line, it posed to as if Mr. Spears, either his client's predecessor paid for the fence, that would go the other way, right? That would indicate that, well, I'm just moving my fence. People sometimes help each other. If they paid for it jointly, that would be a piece of evidence to indicate that that was a joint division line fence. We don't have that evidence. All we have is that the people who got together to build the fence were the owners of the land on both sides of the fence and the owners of the land on both sides of the fence determined where that fence should be rebuilt and in one case they moved it in one location so that it wouldn't be in the middle of the creek. We have that. Who paid for that, we don't know. The fence law puts that obligation on both parties equally and we don't have any evidence that that is what happened or that's not what happened. That's not in the record. And your part in this case was clear and convincing evidence. That's correct. Mr. McClellan, assuming that we find that adverse possession existed and that your clients owned the property by adverse possession, is that recorded anywhere? The judgment in this case, Your Honor, is already recorded in the real estate records, and that would be what the next title searcher would find. Before the judge rendered his decision, was your adverse possession claim recorded? Just to Liz Pendon's. The what? Just to Liz Pendon's. Just to notice that that piece of property was under litigation like you would in a foreclosure case. There's a notice recorded that the ownership of this property is in dispute. When was that done? Well, that would have been done when the case was filed. That would have been several years ago. But that's not a determination of ownership. That's not a determination of adverse possession. Okay, I'm trying to figure out about the statute, the mortgage foreclosure statute. It says that non-record claimants who are notified by publication or who receive notice have their claims extinguished when there's a deed issued in the case. Non-record claimants are actually identified in the statute, judgment holders, lien holders. There's someone who would claim a lien on the property. Unknown owners are simply that, unknown owners, somebody who through airship or something may be an owner and whose ownership may not be of record. Those are the parties who are joined. The key in this case is the part of the foreclosure statute that says when someone takes title through a foreclosure proceeding, they take the property free and clear of the claims of all persons who were made a party to the foreclosure action. My clients were not made a party to the foreclosure action because they were never served with a summons. Mr. Moore's contention is that by publishing the notice in the newspaper of the foreclosure action, that was noticed to my clients. Of course, our contention is my clients are parties in possession of the property. They are not non-record claimants and they are not unknown owners. They are known to everyone who bothers to take a look at the property. I was going to say, how would his client know that, that your clients were in possession of that property? Well, the fence is the main indication. Well, as I said, I've got fences on property that are not property claim fences, just as anecdotally, I guess. And people run fences hit or yon out of their property for keep cattle off here or off there or whatever. And it doesn't make them division line fences if it's not obvious. And so one went out there and looked what made it obvious if he would have walked in his property line and he's got a deed that says I own to the north bank of the creek, which is on the other side of the face fence. How is this fellow supposed to glean that your clients are in possession of the property? Of course, the Joyner v. Jansen case states that record title doesn't mean a thing in an adverse possession case. It is the acts of the party claiming ownership, possession of the property. So what we have to indicate that there's a claim of ownership is that everybody on the south side up until the 1994 change in use ran cattle all the way to the fence. Everybody on the north side either farmed up to the fence or ran cattle up to the fence. And there is testimony. There's testimony by one of the respondents' witnesses indicating that they never had any cattle and they never did any work south of the fence. So it's the use. But Justice McGee was asking about then the foreclosure statute. So if all that's true, then you've got a sheriff's sale. And if your client's claim at the time of the sheriff's sale they owned that property by adverse possession, then I suppose realistically this is out in the rural area. Your clients knew about that sheriff's sale. They knew their neighbor's property was up for sale. And so under the statute, I mean, how somebody comes in later and buys a sheriff's sale, he doesn't know what was going on with that property 10 years ago. How is he supposed to know that you're in possession? In other words, what can he go out there and see that says you're in possession? Now you say a fence with a gate, but is that it? When my clients purchased the property, of course the fence was there. They had every right to assume that that was the line. Even though the title said the creek? The title says Lot 1 and Lot 2. You have to go to the 1895 survey to see that dashed line that goes along the north side of the creek. So the court never answered what is meant by North Bank of the Creek and whether those dotted lines are supposed to indicate a place you can build a fence. But someone who was purchasing that property for a closure sale would have looked at the property, would have every reason to believe that the fence that had been there, and this fence certainly appears to have been there as long as it has, was the division line between Mr. Moore's property and the property owned by my clients. They would have noticed that somebody on the other side of the fence was running cattle. At the time that you purchase something and you do a title search, you go all the way back to the beginning. They would go back to the 1895 deed. And as I understand the record that we have, there's nothing in the record of the property that would put the potential purchaser on notice that your clients are claiming this portion of the property by adverse possession. Is that accurate? There's nothing in the record at all other than that survey plan. If you go all the way back, you would find that. And if they receive a title policy, quite frankly, that won't help them either because the first exception is claims a party is in possession. I don't cover that. Title companies know that all these fences out in the country are not on the line that a surveyor would determine if they went out there today. Okay, but the point is the statute says that if somebody has a claim that's not a record and somebody wants to buy in foreclosure, then the only way that they can notice those people about the foreclosure action is to publish, which the defendant did in this case. He published. Yes, but that's for a non-record claimant, somebody that holds a lien. That's someone whose interest in the property cannot be ascertained from actually inspecting and looking at the property. In every foreclosure action, there's a possibility that someone other than the record owner is in possession, and that's why the statute says under the list of permissible additional parties, parties in possession. And since title is based upon their possession of the property, they're not a non-record claimant. They don't have a claim of a lien. They are in possession of the property made very apparent by the fact that the fence is there. Thank you, Mr. O'Connell. Mr. Spears and Rabona. Thank you. Concerning the survey that's in question from 1895, I do a lot of real estate. Surveys come with pictures, diagrams of what they've surveyed, and if you go out in the field, you can see the pins usually. But there's also what's called the certificate of plaque that goes with those. That's where the meat of the description is, usually the meets and bounds description today under our laws. 1895, I can't tell you what the laws were as far as surveys. They probably weren't regulated back then. But that certificate of plaque that's attached, and it's 831 of the record, or it's 831 of my brief, lists the descriptions that Byers and Thomson bought at their closing as lying south of the north bank of Cedar Creek. That clearly puts their ownership, in my opinion, south of the creek. Now, I don't disagree with Mr. McMillan that they owned the whole creek, too. I think that's right because sometimes you see middle of the creek. That's a common description. But when you see north bank, then, hey, the creek is theirs other than the Corps of Engineers rights as far as navigable waters. And it's not like this creek is a small little creek through a golf course or something. The testimony in the record is it's 20 feet to 30 feet wide. Even one of the appellee's witnesses testified he, when it rains, sometimes intertubes down it. So it's not like it's a small, unnoticeable ditch. It's right there.  And I've looked to indicate that there's knowledge of an agreement, that this was a division fence. The testimony from the appellees and their witnesses are only that the fence was moved further north. Not because we're going to move the property line, but because exactly as Justice O'Brien indicates, because it was sagging into the creek. Accretion and election, I believe, from property law is how creeks move. And you get the ownership as land may be added to your side of the creek or you lose it as it's taken away. It happens all the time on the Mississippi River. And so that fact that there is nothing in the record to indicate that there's a division fence other than what they put in their complaint but never proved by clear and convincing evidence leads back to my argument that my client ought to be getting the benefit of the doubt here, and I don't think he was. He wasn't given the presumption. Now, as far as the appellee's use of this ground, you know, Byers has continually run cattle on his property. Now, whether they ever got north of the creek and how often they do, I don't know. I'm not out there on a daily basis. But I can tell you Thompson's own testimony was he never ran cattle on it from 94 on. So my client didn't take ownership until 1996. There's no way he could have known about the cattle being run in the past on Thompson's property. The fact also I believe is in the record is cattle had at one time been run on the property. One of our witnesses was a prior farmhand to the predecessor and owner to Moore, who I believe testified, while they never ran cattle south of the fence, that was clear. They never did that. He did indicate they ran north of the fence. So why wouldn't they want to maybe build a fence if they were scared that if they don't want their cows to fall in the creek? Because it's not like a gradual bank either. The stream runs west to east there. It's actually not in the Mississippi Valley. It's in the Illinois River Valley, which is odd for our county. And so when the rains, when it floods, it's coming and it's eating away at my client's property, eating into the bank because it's one of those steep banks. So that fact is I can understand. It wasn't in the record, but I think you can take judicial notice that sometimes farmers don't want their cows to get in a creek if they're worried that they may break their legs or whatever. And I think that was clear that there was cattle on the north side of that fence. And Mr. McMillan indicates, too, that there's no access from his own client's property except through my client's property. Well, if they were going to make this agreement of this division fence, wouldn't it make sense that they'd have access to it on the north side? But there's no easements. There was no evidence of the record that their clients have an easement across my client's property on the north to gain access to this fence. If they need to get through it, if there were gates and things like that, that's just it wasn't simply in the record. Thank you. Finally, two points. The cases that they cite are enclosure fence cases. This is not an enclosed fence case. It is simply a straight fence. Now, there is no fence on the east side because the way the creek goes, the fence basically dies into the creek, if you will. It doesn't ever, there's no need other than my client's enclosure to the north. As the fence comes to the east, there's a fence on the north that encloses my client's east property line. And it does the same on the west side. But there aren't fences on the south side making this a neat little enclosure like the Joyner case based on my reading of it means. Finally, you go to the Foreclosure Act. I'm not saying they're a non-record claimant. Non-record claimants are clearly defined. They're an unknown owner. Unknown owners are clearly defined in the statute too. And this Code of Civil Procedure basically gives you the procedure to make those people party to the foreclosure action. I believe they were made a party by the publication notice that was in the foreclosure action where my client bought the property. And that, if anything, starts over the 20-year adverse possession claim, which means they have to start counting in 94 against my client. And it's not 2014 yet, so they lose. I mean, it's a simple analysis because you've got to get 20 years. Thank you. Thank you, Mr. Spears. Mr. McMillan, thank you both for your arguments here this morning. This matter will be taken under advisement. Written disposition will be issued.